**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

———————————————————————

|  |  |  |
|---|---|---|
| **SHERIE MULETT SIMUMBA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 12-30180-DJC** |
| | ) | |
| **CAROLYN COLVIN,[1] Acting Commissioner,** | ) | |
| **Social Security Administration,** | ) | |
| | ) | |
| **Defendant.** | ) | |

———————————————————————

**MEMORANDUM AND ORDER**

**CASPER, J.**                                                  **March 17, 2014**

**I.      Introduction**

Plaintiff Sherie Mulett Simumba ("Simumba") filed claims for disability insurance benefits ("SSDI") and supplemental security income ("SSI") with the Social Security Administration ("SSA"). Pursuant to the procedures set forth in the Social Security Act, 42 U.S.C. §§ 405(g), 1383(c)(3), Simumba brings this action for judicial review of the final decision of Defendant Carolyn Colvin, Acting Commissioner of the Social Security Administration ("the Commissioner"), issued by an Administrative Law Judge ("ALJ") on March 4, 2011, denying her claim. Before the Court are Simumba's motion for judgment on the pleadings, D. 15, requesting reversal of the ALJ's decision, and the Commissioner's motion to affirm that decision, D. 19. In her motion, Simumba contends that the ALJ erred in denying her claim because: (1) the ALJ improperly assigned the opinion from Simumba's mental health provider

———

[1]The Court substitutes Carolyn Colvin, Acting Commissioner of the SSA, as the Defendant in this case. Fed. R. Civ. P. 25(d).

"limited weight," Pl. Mem., D. 16 at 8, and (2) the ALJ failed to evaluate properly Simumba's credibility. Id. at 15.

## II.    Factual Background

Simumba was 43 years old at the time of the ALJ hearing and ceased working on April 21, 2005.  R. 43, 81.[2]  She had previously worked as a receptionist, office assistant, cleaner, cashier, custodian and presser.  R. 71-75, 266.  In her March 11, 2008 application for SSDI and SSI with the SSA, she alleged disability due to a combination of migraines, breast cancer, back pain and bone density issues.  R. 111, 244.

## III.    Procedural Background

Simumba filed claims for SSDI and SSI with the SSA on March 11, 2008, asserting that she was unable to work as of April 21, 2005.  R. 81-85.  Her claims were denied after initial review on July 21, 2008, R. 113-22, and again, upon reconsideration, on April 3, 2009.  R. 125-27.  On June 25, 2009, Simumba filed a timely request for a hearing before an ALJ pursuant to SSA regulations.  R. 128-29.  A hearing was held before an ALJ on November 9, 2010.  R. 40. In a written decision dated March 4, 2011, the ALJ determined that Simumba was not disabled within the definition of the Social Security Act and denied her claims.  R. 12-30.  Simumba appealed this decision.  R. 6-10.  On August 16, 2012, the ALJ notified Simumba that the SSA's Appeals Council had denied her request for review.  R. 1-5.  Accordingly, the ALJ's decision is the final decision of the Commissioner.  R. 1.

---

[2] "R." refers to the administrative record that is filed at D. 14.

**IV.    Discussion**

**A.    <u>Legal Standards</u>**

*1.    Entitlement to Disability Benefits and Supplemental Security Income*

The Social Security regulations define disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 416(i)(1), 423(d)(1)(A); 20 C.F.R. § 404.1505(a).  The inability must be severe, rendering the claimant unable to perform any previous work or any other substantial gainful activity for which the claimant is qualified and exists in the national economy.  42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505(a), 404.1511.

The Social Security regulations set out a five-step process that the Commissioner must use when determining whether an individual has a disability and, thus, whether she is qualified to receive Social Security benefits.  20 C.F.R. § 416.920.  All five steps are not applied to every applicant; the determination may be concluded at any step during the process.  <u>Id.</u>  First, if the applicant is engaged in any substantial gainful work activity, then the application is denied.  <u>Id.</u>  Second, if the applicant does not have, or has not had within the relevant time period, a severe impairment or combination of impairments, then the application is denied.  <u>Id.</u>  Third, if the impairment meets the conditions for one of the "listed" impairments in the Social Security regulations, then the application is granted.  <u>Id.</u>  Fourth, if the applicant's Residual Functioning Capacity ("RFC") is such that she can still perform past relevant work, then the application is denied.  <u>Id.</u>  Fifth and finally, if the applicant, given her RFC, education, work experience, and age, is unable to do any other work that exists in the national economy, the application is granted.  <u>Id.</u>

2.    *Standard of Review*

This Court has the power to affirm, modify or reverse a decision of the Commissioner upon review of the pleadings and record.  42 U.S.C. § 405(g).  Such review, however, is "limited to determining whether the ALJ used the proper legal standards and found facts upon the proper quantum of evidence."  Ward v. Comm'r of Soc. Sec., 211 F.3d 652, 655 (1st Cir. 2000) (citing Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999)).  The ALJ's findings of fact are conclusive when supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence exists "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [the Commissioner's] conclusion."  Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981).

However, the ALJ's findings of fact "are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts."  Nguyen, 172 F.3d at 35 (citations omitted).  Thus, if the ALJ made a legal or factual error, Manso-Pizarro v. Sec'y of Health & Human Servs., 76 F.3d 15, 16 (1st Cir. 1996) (citation omitted), the Court may reverse or remand such decision to consider new material evidence or to apply the correct legal standard.  See 42 U.S.C. § 405(g).

**B.    Before the ALJ**

1.    *Medical History*

Simumba presented the ALJ with documentation about her medical history, including diagnoses and treatment, regarding the conditions upon which she relied in claiming a disability in her application for SSDI and SSI.

    <u>Bipolar Disorder and Anxiety</u>

On December 2, 2003, Dr. David C. Ghostley, Psy.D., met with Simumba for an initial psychiatric evaluation. R. 316. Simumba reported to Dr. Ghostly that she was anxious, depressed and paranoid. <u>Id.</u> Simumba reported suffering from migraines, numbness on the right side of her body, hypertension, hyperthyroid, brain tumors and blood clots, noting that she could physically recognize when the tumors and blood clots were growing. <u>Id.</u> Dr. Ghostley conducted a mental status examination and recorded that Simumba's eye contact, motor activity, language skills, attention level, mathematical skills and memory functioning were adequate. R. 317. He noted that her interpersonal skills were "sufficient to respond appropriately to supervisors, coworkers and work pressures." R. 318. Dr. Ghostley concluded that no prognosis was necessary because Simumba's "psychiatric symptom picture [did] not appear to be clinically significant. . . ." <u>Id.</u> Acknowledging that medical records would be necessary to evaluate the accuracy of Simumba's reported medical conditions and history, Dr. Ghostley recorded in his notes that the "veracity of her report is questionable," particularly because Simumba stated her motivation for the appointment was to obtain financial assistance with her medications, while reporting during that same visit she was not taking any medications at that time. <u>Id.</u>

Simumba was evaluated at New Hope Community Clinic on May 20, 2008. R. 522. On her medical history form, she reported anxiety and depression, along with headaches, pain, arthritis, dizziness, nausea, seizures and high blood pressure. R. 520. She also reported taking Fluoxetine for her depression. R. 523.

Cheryl Friss, M.Ed., conducted an initial evaluation of Simumba at the Center for Psychological and Family Services ("CPFS") on October 16, 2008. R. 608-12. Simumba reported symptoms of depression, anxiety, high blood pressure, diabetes and migraines. R. 608.

Friss initially diagnosed Simumba with major depressive disorder, R. 612, and referred Simumba to a medical appointment with Gina Hughes, RNPC ("Hughes") to obtain medication. R. 555, 602. Friss continued to treat Simumba with counseling sessions on a bi-weekly basis. R. 555. Hughes treated Simumba two more times, noting on February 10, 2009 that Simumba was taking Abilify and that she was "easily engaged" and "less irritable." R. 599. On March 6, 2009, Friss reported that Simumba appeared to have less anxiety and depressive symptoms. R. 598. Friss discharged Simumba on April 28, 2009 because Simumba was planning to travel out of state for an extended period. R. 595. At discharge, Friss stated that Simumba's diagnosis was bipolar disorder and that she had a Global Assessment of Functioning ("GAF") score of 54.[3] Id. She also noted that Simumba had been engaged in treatment and was able to discuss past and current issues. Id. Friss advised Simumba to continue treatment and monitor her health issues and that they could continue treatment at anytime if Simumba returned to the area. Id.

The record contains two Psychiatric Disorder evaluation forms (DDS-0588) from clinicians at CPFS, both of which are dated February 17, 2009. R. 548-55. Friss and Alan Stone, Ph.D. signed one form, R. 555, while Hughes and Dr. Stone signed the other. R. 550. The first two pages of both of the questionnaires are filled out with the same handwriting and all of the answers are identical. R. 548-550, 553-55. Both questionnaires included a diagnosis of bipolar disorder, stating that Simumba has trouble concentrating and with her short-term memory, but "is able to function outside a highly structured living facility." R. 548, 553. On the

_____

[3]"The GAF scale is used to report a clinician's judgment of an individual's overall level of psychological, social and occupational functioning and refers to the level of functioning at the time of evaluation." Vazquez v. Astrue, No. 10–cv–30136, 2011 WL 1564337, at *1 n.1 (D. Mass. Apr. 25, 2011) (citing Diagnostic & Statistical Manual of Mental Disorders ("DSM-IV") at 32–33). A GAF of 51 to 60 indicates "moderate symptoms or moderate difficulty in social or occupational functioning." Vazquez, 2011 WL 1564337, at *1 n.1 (citing DSM-IV at 34) (quotations omitted).

third page of the questionnaire, on the one signed by Friss, it stated Simumba's prognosis was "fair," R. 555, while on the one signed by Hughes, it stated that the prognosis was "guarded . . . risk of reoccurrence of manic episode high," R. 550. On her quarterly report dated March 6, 2009, Friss indicated that Simumba had made significant improvement; she cited Simumba's consistent maintenance of both her appointments and medication, her decreased depression and anxiety and her ability to sleep through the night. R. 598. She also indicated Simumba's current diagnosis was bipolar disorder and that her GAF score was 56. Id.

On January 16, 2009, Dr. Jane Jagelman, Psy.D., met with Simumba for a psychiatric consultation. R. 529. Simumba reported a history of medical problems, including hypertension, migraines, seizures, bowel problems, nausea, breast cysts, congenital brain problems and brain damage. Id. She reported that she had seventeen skull surgeries as a child, after being born with elephantitis of the brain, and that she experienced three comas at ages four, six and thirty-two. Id. Simumba also stated that she suffered from anxiety, self-inflicted cutting and has nightmares. R. 531-32. She also reported a traumatic family history. R. 529. Dr. Jagelman recorded that Simumba presented symptoms of borderline personality disorder, obsessive compulsive disorder and post-traumatic stress disorder. R. 533. Dr. Jagelman noted that Simumba may have bipolar disorder, but that she would have to be monitored over a longer period of time to make that diagnosis. Id. Dr. Jagelman also stated that Simumba's stories often seemed "implausible," but that it was likely there were medical records available to support her reports, adding that Simumba did not appear psychotic, nor gave Dr. Jagelman any reason to distrust her. Id.

b)      Physical Conditions

Although not the focus of Simumba's contentions on appeal, the Court briefly summarizes the medical evidence related to Simumba's history of physical conditions, including

migraines, high blood pressure, fluid in her legs, back pain and poor bone density. The ALJ discussed this evidence as part of her evaluation of Simumba's credibility. R. 19-28.

The record reflects Simumba's medical reports dating back to 2002, which have been compiled from different sources, including physicians, hospitals and psychologists. Many of these reports consist mainly of patient questionnaires and physician notes that primarily capture Simumba's self-reported medical history, some of which is contradicted, or at least, is not supported by medical evidence. For example, Simumba reported having a hole in her skull as a result of a tumor removal to Dr. Ghostley in 2003, R. 316, which she again reported to the Southeast Alabama Medical Center in 2005, R 362, that she was born with a blood clot in her brain to The Kirklin Clinic in 2007, R. 429, and elephantitis of the brain, as well as being born with a tumor, to Dr. Jagelman in 2009, R. 529. No pediatric medical records are included in the record, although a 2005 CT scan of Simumba's head identified no abnormalities. R. 369. Simumba has reported suffering from chronic migraines throughout adulthood. R. 54, 446, 534. She testified that she retreats to a dark room alone when she has migraine pain. R. 54, 55. By contrast, she has told at least one physician that the migraine pain dissipates within five minutes of administering her medication. R. 534. Simumba also testified that her blood pressure medication made her dizzy, despite having taken it for six years. R. 44-45. Further, Simumba reported chronic back pain and had gone to the emergency room multiple times because of pain and fear of a fracture. R. 49-52. The x-rays that Simumba in the record reveal no injuries or deterioration of any bone or tissue. R. 322-23, 344. Finally, Simumba has reported a history of breast lumps to several physicians. R. 429, 529. Simumba had a benign lump removed from her breast in May 2007. R. 374, 384. Despite this medical evidence, she reported having had a

history of breast cancer on a patient intake form in 2008, R. 606, and included breast cancer on her SSA application for disability benefits.  R. 111, 244.

2. *RFC Assessments and Other Evaluations by Massachusetts Disability Determination Services*

The record also contains two assessments of Simumba's mental RFC and one assessment of her physical RFC, dated July 18, 2008, January 31, 2009 and March 18, 2009 respectively.  R. 451-78, 537-44, 556-77.  Physicians retained by Disability Determination Services ("DDS") of the Department of the Massachusetts Rehabilitation Commission performed these assessments. There were also three Disability Evaluation Services reports, dated September 28, 2008, November 19, 2008 and January 29, 2009, respectively, completed by two physicians from University of Massachusetts Medical School.  R. 501-06, 509-15, 534-36.

On July 18, 2008, state agency psychiatrist M. Hope Jackson, Ph.D., completed a Physiatrist Review Technique form for the periods April 21, 2005 through March 31, 2006, R. 451-464, and March 11, 2008 through July 18, 2008.  R. 465-78.  Dr. Jackson concluded that there was "no medically determinable impairment" in either period, R. 451, 465, and that Simumba has the "interpersonal skills sufficient to respond appropriately to supervisors, coworkers and work pressure.  R. 477.  She also noted that the "claimant does not wish to pursue a mental allegation which would require her attending an exam to establish a diagnosis." Id.

Dr. S. Fischer, Psy.D., completed a Psychiatric Review Technique form on March 18, 2009.  R. 556.  Dr. Fischer indicated Simumba suffered from bipolar disorder.  R. 559.  He noted on the evaluation form that Simumba experienced moderate limitations on maintaining concentration and social functioning, but that there was insufficient evidence that these limitations restricted her ability to perform the activities of daily living.  R. 566; see also 20 C.F.R. § 404, Subpt. P, App. 1, 12.04(B) (listing impacts of affective disorders on daily living

activities, as recognized by SSA when determining disability). Dr. Fischer concluded in his Mental RFC summary that Simumba did not have any impairment, could "carry out simple instructions in a normal workday/workweek," could "interact for work-related issues" and could "adapt to routine stressors." R. 572.

Dr. Robert McGan performed the physical RFC assessment on January 31, 2009. R. 537-44. Dr. McGan's physical RFC evaluations indicated that Simumba could occasionally lift and carry twenty pounds, could frequently lift and carry ten pounds, could stand, walk and sit with normal breaks for about six hours in an eight-hour workday and was not otherwise limited in her ability to push and pull. R. 538. The physical evaluation indicated that she had no postural, manipulative, visual, communicative or environmental limitations. R. 539-41. Dr. McGan also determined that there was no treating or examining source statement in her file. R. 543. Dr. McGan stated that light exertion would be "reasonable." R. 539.

Dr. Vijay Patel completed two Disability Evaluation Services forms on behalf of Simumba on September 28, 2008 and November 19, 2008, respectively. R. 501-06, 509-15. On the September 28, 2008 form, Dr. Patel indicated that Simumba had been disabled for more than one year due to an anxiety disorder. R. 501-02. Dr. Patel did not provide answers for most of the questions on both questionnaires, leaving the medical/psychiatric history and additional impairment sections blank. R. 503. Under the Physical Functioning sections, Dr. Patel wrote "no opinion" as the only answer to all of the questions regarding Simumba's limitations on stooping, bending, carrying and executing activities of daily living independently. R. 503-04, 509-10. In the Mental Functioning section on both questionnaires, Dr. Patel wrote "to be evaluated by psychiatrist." R. 505, 512-14.

Dr. Sun-Tien Lin examined Simumba on January 22, 2009 on behalf of Disability Evaluation Services. R. 534-36. He conducted a full physical examination and reviewed Simumba's past medication list, as well as discussed her symptoms and medical history. Id. He noted that Simumba complained of migraines four to five times per month, but that her medication helped to relieve them within five minutes. R. 534. Dr. Lin questioned Simumba's medication list, stating that she only had filled her migraine medication twice in five months, each time for a small number of pills, and that the nausea medication she reported taking daily was not listed at all. R. 535-36. His impressions indicated allergies, migraines, back pain and abdominal pain and a diagnosis of shin pain. R. 535.

3.  *ALJ Hearing*

At the November 9, 2010 administrative hearing, the ALJ heard testimony from two witnesses, Simumba and vocational expert ("VE") Mr. Michael Dorval. R. 42. Simumba testified that she had last worked in 2004, but had stopped due to illnesses, including "migraines, high blood pressure, back issues, hypertension." R. 43. Simumba testified that she was on blood pressure medication that caused dizziness, had cellulitis twice in the past year and had inter-vertebrae disc swelling. R. 44-50. She reported that these conditions had required her to visit the emergency room several times in the past six years. R. 47-51. She reported experiencing pain and numbness in her back and legs after sitting for too long and indicated her belief that she may have had carpal tunnel syndrome. R. 64-65. She stated that she suffered from migraines about twice a day, which cause her to need to sit alone in a dark room, but confirmed that her migraine medication provided relief. R. 54-55. Simumba also took medication for bipolar disorder, a condition which prevents her from working "because I'm edgy, I'm not attentive as I was before, I'm not sure what I'm doing." R. 56. She reported that she cried a lot, did not want

to leave her room and had no interest in anything. D. 59. Her medications made her dizzy and prevented restful sleep. R. 62-63. Simumba also testified that everything made her anxious, including getting dressed and making decisions and that she felt overloaded around crowds of people. R. 63-64. Simumba was living with relatives and had changed her living situation a couple of times. R. 57.

The VE testified that Simumba had worked as a receptionist, which he categorized as a sedentary, semi-skilled job with a specific vocational preparation level of 3. R. 77-78. He also testified she had worked as a general airport cleaner, office clerk and laundry presser, all of which he described as light, unskilled jobs. Id. The ALJ then presented the VE with a hypothetical involving a person with a RFC that permitted light exertion and the ability to concentrate for two hours at a time before requiring a break, but who had to avoid concentrated exposure to hazardous machinery and asked the VE if that person would be able to perform Simumba's past work. R. 78. The VE responded that all of Simumba's prior work could be performed with that hypothetical RFC. Id. The ALJ then asked if, with the same conditions as the first hypothetical including light exertion, but with no other restrictions and the same mental considerations, a claimant could perform Simumba's past work. Id. The VE gave the same answer, acknowledging that a claimant in this second scenario could also perform Simumba's past work. Id. Simumba's counsel then asked the VE whether there would be jobs available to the same hypothetical person if that person also would be "off task due to psychological symptoms twenty-five percent of the workdays." R. 79. The VE replied that such claimant could not perform any of Simumba's past work "or any others on a full-time basis." Id.

*4.      Findings of the ALJ*

Following the five-step process outlined in 20 C.F.R. § 416.920, at step one, the ALJ found that Simumba had not engaged in substantial gainful activity since April 21, 2005.  R. 17. At step two, the ALJ found that Simumba suffered from two severe impairments:  bipolar disorder and lumbago.  Id.  At step three, the ALJ found that Simumba did not have any impairment, singly or in combination, that was one of the "listed" impairments in the Social Security regulations.  Id.

Before proceeding to step four, the ALJ determined that Simumba has the RFC "to perform light work," but that "she needs to avoid concentrated exposure to hazards such as dangerous machinery."  R. 19.  In this finding, the ALJ noted that Simumba "is able to concentrate for two hours at a time before needing a break."  Id.  Simumba disputes this finding, arguing that the ALJ overlooked the evidence of her mental limitations, caused by bipolar disorder, that further limit her RFC and prevents her from performing any job.  D. 16 at 8, 15.

At step four, based on the RFC determination, the ALJ found that Simumba was able to perform all of her past relevant work.  R. 29.  For this reason, at step five, the ALJ determined that Simumba was not disabled.  Id.  Simumba disputes the ALJ's conclusion regarding the limitations of her RFC and the ALJ's ultimate conclusion that Simumba was not disabled.  D. 16 at 8.

**C.      Simumba's Challenges to the ALJ's findings**

Simumba contends that the ALJ's determination that Simumba was not disabled because she had the RFC to perform "light work" fails to incorporate her mental limitations due to bipolar disorder.  D. 16 at 8.  Simumba first argues that the ALJ should have given controlling weight to Simumba's treating mental health provider, Friss.  Id.; see 20 C.F.R. § 404.1527(c)(2).

Second, Simumba argues that the ALJ failed to evaluate her credibility properly. D. 16 at 15. For the reasons discussed below, the Court finds no reversible error and affirms the ALJ's decision.

### 1. ALJ's Evaluation of the Medical Opinions

Simumba argues that the ALJ erred when she afforded limited weight to the opinion of her treating mental health clinician, Friss, because the ALJ was required to give controlling weight to Simumba's treating source. D. 16 at 8-10. Simumba also argues that the ALJ must consider evidence from all other sources under 20 C.F.R. 404.1513(d), and that the ALJ failed to meet her obligation to "adequately explain" the weight she assigned to Friss's opinion. See Taylor v. Astrue, 899 F. Supp. 2d 83, 88-89 (D. Mass. 2012). D. 16 at 12. By affording Friss's opinion "limited weight," Simumba contends that the ALJ overlooked mental limitations that should have been included in Simumba's RFC. D. 16 at 8-15.

An ALJ should give controlling weight to a treating physician's opinion if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2). If the ALJ determines that the treating physician's opinion is not entitled to controlling weight, the ALJ must determine the amount of weight the opinion is entitled to based on the following six factors: (1) "[l]ength of treatment relationship and the frequency of examination," (2) "[n]ature and extent of the treatment relationship," (3) "[s]upportability" of the medical opinion, (4) consistency of the opinion "with the record as a whole," (5) "[s]pecialization" of the treating source, and (6) "other factors . . . that tend to support or contradict the opinion." Id. § 404.1527(c). In addition, "the Commissioner must always give good reasons in his notice of decision for the weight he gives a claimant's treating source's

opinion. Giving "good reasons" means providing specific reasons that will allow subsequent reviewers to know the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." Haggblad v. Astrue, 11-CV-028-JL, 2011 WL 6056889 (D.N.H. Nov. 17, 2011) (citations, internal quotation marks and alterations omitted), report and recommendation adopted sub nom. Haggblad v. U.S. Soc. Sec. Admin., Com'r, 11-CV-28-JL, 2011 WL 6057750 (D.N.H. Dec. 6, 2011) The ALJ's reasons must also be supportable and reasonable. Id. at *7-8. The ALJ is not required to discuss each factor under 20 C.F.R. § 404.1527(c) in her decision, so long as she gives good reasons, supported by the evidence in the record, for the weight she ultimately gives to the treating physician's opinion. Crocker v. Astrue, No. 07-220-P-S, 2008 WL 2775980, at *9 (D. Me. June 30, 2008); see also Delafontaine v. Astrue, No. 1:10-cv-027-JL, 2011 WL 53084, at *14 (D.N.H. Jan. 7, 2011) (stating that "an ALJ is not required to methodically apply [the factors] so long as the ALJ's decision makes it clear that these factors were properly considered"); Braley v. Barnhart, No. 04-176-B-W, 2005 WL 1353371, at *4 (D. Me. June 7, 2005) (noting that "the plaintiff does not cite, nor can [the court] find, any First Circuit authority for the proposition that an [ALJ] must slavishly discuss each of these factors for his consideration of a treating-source opinion to pass muster"). The factors provide a balancing test, not a checklist. See Conte v. McMahon, 472 F. Supp. 2d 39, 48-49 (D. Mass. 2007) (calling the factors "the quintessential balancing test" and stating ALJ has the discretion to stress certain factors as long as supported by substantial evidence).

Only "acceptable medical sources" can be considered treating sources, whose medical opinions may be entitled to controlling weight under 20 CFR § 404.1527(c) and § 416.927(c). A "treating source" is defined in the regulations as the claimant's "physician, psychologist, or other acceptable medical source who provides [the claimant], or has provided [the claimant], with

medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you." 20 C.F.R. § 416.902. The term "acceptable medical sources" refers to a specific regulatory category of sources, limited to licensed physicians, licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists. 20 C.F.R. § 404.1513(a). The ALJ may use evidence from "other sources" to determine the severity of the impairment and how it affects the claimant's ability to work." 20 C.F.R. § 404.1513(d). These "other sources" include non-physician medical sources, such as nurses, physician's assistants and therapists, as well as education personnel, private and public social workers and other primary caregivers. Id. The ALJ is not required to apply the factors listed in 20 C.F.R. § 416.927(c)(1)-(6) to "other sources," nor to list "good reasons" for the weight afforded to these other sources; however, the ALJ "must adequately explain [her] treatment of the opinion so that a reviewer can determine if the decision is supported by substantial evidence." Taylor, 899 F. Supp. 2d at 88-89.

The ALJ treated Friss's assessment as an "other source." See R. 28 (noting that neither Friss nor Hughes were "acceptable medical sources"). Because there is no evidence in the record to support that Friss is a licensed physician or psychologist, and is only referred to by Simumba as a "mental health provider," D. 16 at 8, the Court cannot state that the ALJ erred in this categorization.[4] While Simumba argues that Friss should be afforded controlling weight as a treating source, Friss does not have a professional designation that can support her authority as a treating source. See Cruz v. Astrue, No. 11-40054-FDS, 2012 WL 220535, at *7 (D. Mass. Jan.

_____

[4] Cheryl Friss's title and designation is not formally stated in the record. Plaintiff refers to Friss as "M.Ed." throughout her brief, Pl. Mem., D. 16 at 8, and refers to her an "other source." Id. at 11-12. The Psychiatric Disorder Questionnaire signature line has an asterisk stating that if the evaluator is not a M.D. or licensed psychologist, then a co-signator with one of these designations is needed. Id. Alan Stone, Ph.D., co-signed Friss's evaluation. Id.

24, 2012) (stating that "[a] clinician is not an acceptable medical source and is treated as another source of evidence"); <u>Randall v. Astrue</u>, No. 09-cv-11273-NG, 2011 WL 2649967, at *1 (D. Mass. July 5, 2011) (noting licensed mental health counselor not acceptable medical source because not a licensed or certified psychologist); <u>Cinq Mars v. Barnhart</u>, No. 05-30137-MAP, 2006 WL 961913, at *6-7 (D. Mass. Apr. 6, 2006) (recognizing that therapists are not acceptable medical sources under regulations).  Here, given that there is no evidence to the contrary, the ALJ correctly applied the regulations in categorizing Friss, presumably a therapist or counselor based upon her education, as an "other source."  Therefore, the ALJ was not bound by the factors listed in § 416.927(c)(1)-(6) during her evaluation of the opinion.  Simumba correctly notes that the ALJ could have assigned more weight to Friss's medical opinion, as courts permit an opinion from an "other source" to be given equal or greater weight than an "acceptable medical source," depending on the facts of the case.  <u>Taylor</u>, 899 F. Supp. 2d at 88.  However, it also was entirely within the ALJ's discretion to conclude that the opinion should not be afforded great weight as long as she explained the reasons for her decision.  <u>See</u> <u>id.</u>; <u>see</u> 20 C.F.R § 404.1527(c)(2).

The SSA provides some guidance on how judges may evaluate a medical opinion from an "other source:"

> For opinions from sources such as teachers, counselors, and social workers who are not medical sources, and other non-medical professionals, it would be appropriate to consider such factors as the nature and extent of the relationship between the source and the individual, the source's qualifications, the source's area of specialty or expertise, the degree to which the source presents relevant evidence to support his or her opinion, whether the opinion is consistent with other evidence, and any other factors that tend to support or refute the opinion.

Social Security Admin., SSR 06-03p, Titles II and XVI: Considering Opinions and Other Evidence from Sources Who Are Not "Acceptable Medical Sources" in Disability Claims;

Considering Decisions on Disability by Other Governmental and Nongovernmental Agencies, 71 Fed. Reg. 45593-03, 45596 (Aug. 9, 2006).

Although Simumba argues that the ALJ did not provide sufficient reasoning for assigning "limited weight" to Friss's opinion, the ALJ enumerated a number of different reasons supporting her decision, many of which mirror the factors recommended by the SSA. First, she addressed the nature and extent of Friss's counseling, concluding that Friss treated Simumba for only six months, a relatively short period considering that Simumba claims that she has been disabled since 2005 and did not seek counseling treatment for mental illness prior to October 2008. R. 28. Second, the ALJ properly classified Friss as an "other source" after determining that her professional qualifications were those of a counselor or therapist, rather than a licensed physician or psychologist. R. 28; see 20 C.F.R. § 404.1513(d). Because the ALJ could not deem Friss a treating source under its definition in 20 C.F.R. § 416.902, the ALJ had no obligation to afford Friss's opinion controlling weight. See 20 CFR § 404.1527(c)-(d). Third, the ALJ evaluated the relevant evidence presented by Friss, but determined that the two Psychiatric Disorder Questionnaires lacked credibility because, as discussed in more detail below, Friss likely filled out the substantive portions of both questionnaires. R. 28. Fourth, given that the questionnaires' first two pages were identical, the ALJ identified that the difference in the prognosis represented clinical inconsistency. Id. Fifth, there was an absence of any behavioral examples or objective testing of Simumba's mental limitations in Friss's documents, suggesting that Friss solely relied on Simumba's self-reported symptoms to make her diagnosis. Id. Sixth, the ALJ evaluated the extent to which Friss's medical opinion compared to the medical evidence as a whole, concluding that Friss's report was somewhat inconsistent with the balance of the evidence in the record. Id. The ALJ also noted that Simumba's history of moving between

residences and states directly contradicts Friss's statement that Simumba has "difficulty with changes in schedule and/or task." Id. Friss also stated that Simumba ceased working due to physical conditions, but there is no evidence Friss independently verified Simumba's medical history. Id. at 28-29.

Although Simumba argues that Friss's report is at least consistent with Dr. Jagelman's report, any inconsistency between a medical opinion and the rest of the record is a sufficient reason for a judge to accord limited weight to the credibility of that medical opinion. See Abubakar v. Astrue, No. 1:11-cv-10456-DJC, 2012 WL 957623, at *10 (D. Mass. Mar. 21, 2012) (noting that ALJ has discretion to assign weight to medical opinions based on consistency with overall record). Here, the ALJ met the required explanation standard by providing multiple reasons for her decision to give this opinion limited weight, all of which have substantial support in the record. This Court determines that the ALJ provided an adequate explanation and finds no error in her decision to assign Friss's medical opinion "limited weight."

### 2. *Credibility of Claimant*

Simumba argues that the ALJ failed to evaluate her credibility properly. D. 16 at 15-17. "Credibility determinations, while the sole responsibility of the ALJ, 'must be supported by substantial evidence[,] and the ALJ must make specific findings as to the relevant evidence he considered in determining to disbelieve the [claimant].'" Carr v. Astrue, No. 09-cv-10502–NG, 2010 WL 3895189, at *6 (D. Mass. Sept. 30, 2010) (quoting Da Rosa v. Sec'y of Health & Human Servs., 803 F.2d 24, 26 (1st Cir. 1986)). Additionally, "the credibility determination by the ALJ, who observed the claimant, evaluated [her] demeanor, and considered how that testimony fit in with the rest of the evidence, is entitled to deference, especially when supported by specific findings." Frustaglia v. Sec'y of Health & Human Servs., 829 F.2d 192, 195 (1st Cir.

1987); <u>Becker v. Sec'y of Health & Human Servs.</u>, 895 F.2d 34, 36 (1st Cir. 1990) (giving weight to the ALJ's credibility determinations because the ALJ has the opportunity to view the witnesses and possesses special expertise and knowledge of subject matter).

The ALJ correctly recognized the process for evaluating the credibility of a claimant's statements about her symptoms. R. 19 <u>see also</u> 20 C.F.R. § 404.1527. Accordingly, to the extent that the ALJ's was required to evaluate the intensity and persistent and limiting effects of claimant's symptoms to determine the extent to which they limited her functions, the ALJ properly recognized that "whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the [ALJ] must make a finding on the credibility of the statements based on a consideration of the entire case record." R. 19.

Simumba argues that the ALJ erred in making the credibility determination of her symptoms by subjectively evaluating the medical evidence to find "what she perceived to be inconsistencies" and overlooking the medical opinions that support Simumba's mental health limitations. D. 16 at 15. To support her claim, Simumba points out that there is consistency between Friss's medical opinion, her testimony and the VE's testimony. <u>Id.</u> at 15-16. According to Simumba, Friss's records from Simumba's therapy sessions document her difficulty concentrating, focusing for extended periods of time, completing complicated tasks and dealing with changes in schedule. R. 548-49. Simumba contends her testimony about these issues, R. 63-64, sufficiently corroborates Friss's opinion. D. 16 at 15-16. Additionally, she asserts that the VE's testimony that Simumba would not be employable if she were "off task" for twenty-five percent of the workday further demonstrates that these mental limitations prevent Simumba from working. <u>Id.</u> at 16; R. 79.

Contrary to Simumba's contention, however, the ALJ's decision reflects that she engaged in such analysis and made such findings here. The ALJ found Simumba "not entirely credible," concluding that she "failed to establish a correlation between her allegations and the objective medical evidence in the record." R. 21. The ALJ explained that her decision relied upon a balance of "objective physical evidence (testing, examination, history of treatment) combined with the credible subjective complaints of the claimant and the expert assessment of medical care consultants/examiners" to determine the issue of disability. R. 19.

The ALJ's explanation of her final decision reveals that she did not ignore Simumba's testimony or credible evidence regarding her mental limitations, but did not find all of Simumba's testimony credible in light of other evidence in the record and gave lesser weight to medical opinions not supported by objective evidence. Instead, after careful review of the record, the ALJ noted that Simumba's case suffered from two issues: "a lack of objective support" (i.e., "testing, examinations, history of treatment") and "questions to credibility" (i.e., noting that she "cannot accept the claimant at their word regarding their pain and limitations when presented with evidence that questions their credibility"). R. 19; see 42 U.S.C. 423(d)(5)(A) ("[a]n individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability . . .there must be medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques, which show the existence of a medical impairment that results from anatomical, physiological, or psychological abnormalities which could reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all evidence required to be furnished . . . would lead to a conclusion that the individual is under a disability").

As to the claimant's credibility, the ALJ noted that three physicians had questions Simumba's credibility regarding her reports of limitations and symptoms. R. 19, 21, 24-26, 28. These doctors included Dr. Ghostly (in regard to an examination for disability benefits), R. 19, 21, Dr. Jagelman (who had examined Simumba in 2009 and concluded that "her story and reported history seemed almost implausible" and presumed that there would be medical reports to corroborate her claims), R. 20, and Dr. McGan (who did not examine Simumba, but upon review of her medical records "noted several inconsistencies between her allegations and her medical records including, but not limited to her misrepresentation that she has had breast cancer). R. 20; see also R. 21-28 (observing that multiple physicians stated in their files that they do not have the medical records to verify Simumba's reported medical history).

As to objective medical evidence, the ALJ observed that a number of the medical providers, including Friss upon whose opinion Simumba heavily relies, who submitted evidence failed to conduct objective testing to evaluate Simumba's self-reported symptoms and medical history. R 25-26, 28. The ALJ assigned greater weight to the opinions of providers who conducted objective testing of Simumba because those tests supported an independent conclusion. The ALJ assigned limited weight to each of the opinions that did not rely upon objective testing. Id.; see Rodriguez Pagan v. Sec'y of Health & Human Servs., 819 F.2d 1, 4 (1st Cir. 1987) (supporting ALJ assignment of limited weight to medical evaluations not based on objective testing); Robertson v. Astrue, No. 11-30204-PBS, 2012 WL 4343650, at *7 (D. Mass. Sept. 20, 2012) (stating ALJ may "attribute lesser weight" to evaluations based on patient's reported symptoms, not testing); Machado v. Astrue, No. 09-045A, 2009 WL 3837226, at *12 (D.R.I. Nov. 13, 2009) (finding same).

Accordingly, the ALJ gave "little weight" to Dr. Patel's assessment of Simumba because he "did not identify any significant physical or psychiatric limitations," indicated that she would need to be evaluated by a psychiatrist for her mental symptoms and his opinion was "so sparsely documented." R. 23-24. The ALJ also gave "little weight" to Dr. Jagelman's assessment because "although she appeared to question the claimant's statements and reported history, she did not attempt to validate or test the claimant's statements," "she did not review any other medical records with which to compare and contrast the claimant's reported symptoms and limitations," "she did not conduct any objective psychological testing to aid in her evaluation of the of the claimant's symptoms," and "she appears to have based her opinions and conclusions to a large degree on the claimant's statements." R. 25. The ALJ also gave "limited weight" to the psychological assessments signed by Hughes and Friss (co-signed by Stone), respectively. R. 28. As previously discussed, given the similiarity between the handwriting and contents on the two forms, the ALJ reasonably concluded that the forms contained information primarily drawn from Friss. Although concluding that neither was an "acceptable medical source," the ALJ still considered the assessments but gave them little weight because, among other reasons, there was an "inconsistency" in the prognosis given despite the same information, "none of the answers contain specific examples of behaviors observed by the signators," "no psychological testing was conducted by this institution or therapist to further evaluate the claimant's symptoms," they had "only been seeing the claimant since relatively recently," and the conclusion that changes in schedule or task could cause the claimant anxiety was "contradicted by the fact that the claimant has changed residences many times which is evidence of her ability to adapt to changes, rather significant changes, because they relate to her home." D. 28 (noting claimant's testimony about moving back and forth from Ohio, Alabama and Massachusetts); see D. 42, 49, 57.

By contrast, the ALJ assigned "great weight" to Dr. Lin's opinion because he conducted objective testing during his evaluation. Specifically, his opinion reflected that he "documented his physical finds contemporaneously with his examination," "appeared to have reviewed other records with which to compare and contrast the claimant's reported symptoms and limitations" and "appeared to have objectively assessed her complaints and not placed an undue amount of weight on her self-reporting of symptoms." D. 26. This is not a case in which, as Simumba contends, D. 16 at 17, the ALJ has ignored medical evidence and has substituted her opinion. Instead, here, there was little to no objective medical evidence supporting the claimant's position that she suffered from disabling conditions.

Based upon this record and careful analysis, there was no error in the ALJ concluding that "[i]n reviewing all of the evidence and opinions in detail above, as well as the claimant's description of her symptoms, I find [Simumba] has little to prevent her from working." R. 29. Simumba's testimony and Friss's assessments both indicate that the medication for her bipolar disorder has helped Simumba improve her functionality. Id. As for her physical challenges with high blood pressure, migraines, cellulitis and back pain, the ALJ found that Simumba's testimony did not demonstrate any physical incapacity. Id. She testified that her blood pressure and migraine medications both improve her functionality, antibiotics cured her cellulitis and her x-rays of her back were normal. Id. While Simumba argues the ALJ improperly discredited her veracity, the ALJ's decision reflects careful consideration of the record including Simumba's testimony and statements and that the ALJ's conclusions as to her credibility and her ultimately finding of no disability were supported by substantial evidence.

Concluding that the ALJ applied the right legal standard in reaching her decision and that the decision was supported by substantial evidence, the Court AFFIRMS the ALJ's decision.

**V.      Conclusion**

For the foregoing reasons, the Commissioner's motion for an order affirming his decision, D. 19, is GRANTED and Simumba's motion for judgment on the pleadings, D. 15, is DENIED.

**So Ordered.**

/s/ Denise J. Casper<br>United States District Judge